Friedman, J.E
(dissenting in part). The majority opinion is something of an anomaly. Although it affirms the denial of the motion by the defendant law firm, Cadwalader, Wickersham & Taft, LLP (Cadwalader), for summary judgment dismissing a cause of action for malpractice, the majority rejects — correctly, in my view — each of the appellate arguments made by Cadwalader’s former clients, plaintiffs Nomura Asset Capital Corporation and an affiliated entity (collectively, Nomura), for the existence of a triable issue as to whether Cadwalader committed malpractice in advising Nomura on the subject transaction, a securitization of 156 commercial loans that closed in 1997. Thus, the majority explains in detail the record facts that lead it to conclude, as a matter of law, that Cadwalader provided Nomura with proper legal advice and (by Nomura’s own choice) was not generally responsible for conducting due diligence for the transaction. Nonetheless, the majority finds that the matter must be sent to trial based solely on one document setting forth the “Deal Highlights” of one of the 156 securitized loans — a document that Nomura did not include among the more than 1,200 exhibits it submitted with its original opposition to the *247 summary judgment motion, that Nomura did not show to either of the two experts it retained to opine on the applicable standard of care (whose respective reports therefore do not refer to it), that Nomura barely touched upon in its appellate brief, and that neither side mentioned at its own instance at oral argument before us.[1]
I cannot fault the parties for having failed to anticipate the epochal significance with which the majority invests the Deal Highlights document. As more fully discussed below, that document has nothing in it to indicate that the loan with which it deals was more likely to be inappropriate, under the applicable body of law, for inclusion in the securitization than any of the other 155 loans with which it was being securitized. While there is indeed a document in the record that arguably should have alerted an attentive professional to the possible existence of a problem with the loan, that document — an appraisal of the property securing the loan — was not provided to Cadwalader before the securitization closed because Nomura had not retained Cadwalader to review appraisals of the properties that secured the loans.[2] In my view, therefore, Cadwalader is entitled to summary judgment dismissing Nomura’s legal malpractice claim in its entirety.
According to the majority, the Deal Highlights document, which Nomura faxed to Cadwalader about three weeks before *248 the closing, was a “red flag” that should have alerted Cadwalader to the possibility that the loan it described (hereinafter, the Doctors Hospital loan) might disqualify the securitization for favorable tax treatment as a real estate mortgage investment conduit (REMIC). In summary, to qualify for inclusion in a REMIC securitization under federal tax law, the $50 million Doctors Hospital loan (which had been made to an operating acute-care hospital of that name) was required to be secured by real property with a value of at least $40 million when all elements of personal property were excluded from the appraisal, so that the ratio of the value of the secured real property to the value of the loan (the VTL ratio) would be at least 80%. The majority reasons that the Deal Highlights document was a red flag because, although it stated that the value of the hospital securing the loan was $68 million (a figure that would yield a VTL ratio of 136%, far more than the required 80%), the document also stated that the valued loan collateral included, in addition to the land and building, the hospital’s operations as a going concern, with no breakout of the value of the real property alone.
If I agreed with the majority that, on this record, the information in the Deal Highlights document could reasonably be found to constitute a “red flag” that should have prompted Cadwalader to make further inquiry, I would join in affirming the denial of summary judgment. After all, even while they took the position (with which the majority agrees) that Cadwalader was not responsible for conducting due diligence, Cadwalader’s expert witnesses and its senior REMIC partner, Charles Adelman, Esq., agreed in their testimony that it would have been appropriate for the firm to raise an issue with Nomura if any information came to Cadwalader’s attention that reasonably put in question the qualification of any of the loans for REMIC treatment. Nothing in the record, however, supports the majority’s conclusion — a conclusion that Nomura itself has not asked us to draw — that the Deal Highlights document, merely because it stated that the appraisal included the hospital’s value as a going concern, should have alerted Cadwalader to a potential problem with the loan, given that Cadwalader had already properly advised the client about the REMIC rules (as determined by the majority). To reiterate, if there was any red flag in this case, it was a document that Nomura, but not Cadwalader, had in its possession when the securitization closed, namely, the August 1997 appraisal of the hospital, which had *249 been prepared as the basis for the underwriting of the Doctors Hospital loan.[3]
At this point, it is useful to recapitulate what the record establishes, as the majority and I for the most part agree, about the advice Cadwalader gave Nomura about the REMIC rules. Cadwalader properly advised Nomura: (1) that, for the securitization to qualify for REMIC tax treatment, each loan was required to have a VTL ratio of at least 80%; and (2) that, in determining a loan’s VTL ratio, only the value of the mortgaged real property itself (meaning the land, its structural improvements and intangible interests inextricably linked to the real property) could be considered, while the value of any personal property (tangible or intangible) deemed by the Internal Revenue Service to be separable from the real property had to be excluded.[4] In view of the complexity of determining which intangible interests and physical personal property could be included in the real-property value figure, Cadwalader advised Nomura to ascertain, at the outset, a value for assets that were “plainly real property (such as land and structural improvements, or ‘sticks and bricks’)” and then to “inquire further” if those items alone did not meet the REMIC 80% threshold.[5]
*250 It is undisputed that Nomura, having been advised as described above, did not raise any question with Cadwalader about the Doctors Hospital loan’s REMIC eligibility while the securitization was being put together. Rather, Nomura provided Cadwalader with the bottom-line, $68 million income-based valuation the appraiser had placed on the hospital, a figure that appeared in a table of financial data on each loan that was to be appended as a supplement to the securitization prospectus, as well as in the Deal Highlights document. The $68 million valuation was not broken down into different components in the prospectus supplement (just as it was not in the Deal Highlights document), but this was no different than the information provided to Cadwalader for any of the other loans. In each case, Cadwalader was given a bottom-line valuation figure for the property securing the loan.
Further, that Doctors Hospital was an operating, income-producing business did not serve to distinguish it from the properties securing any of the other loans. Contrary to the majority’s unfounded implication that the other loans may have been secured by property that did not produce income (such as raw land, empty buildings or owner-occupied homes), Mr. Adelman, Cadwalader’s senior REMIC partner, testified without contradiction that loans included in REMICs are invariably secured by income-producing properties:
“All of the loans in a REMIC, to one degree or another, are income generating properties. They all are. There is no raw land in a REMIC. So, to that extent, one commercial property is much like another in terms of its analysis, in terms of its cash flow, its debt service coverage.”
Thus, there is no warrant for the portentous significance the majority ascribes to the statement in the Deal Highlights document that the loan collateral included the hospital’s “land, building and operations”; the same was true of every other loan in the securitization. Stated otherwise, while it is true that the inclusion of “operations” in the collateral of the Doctors *251 Hospital loan meant that less than 100% of the mortgaged property’s value constituted REMIC-qualified real estate, the same could be said of every one of the 156 loans.
To understand why each of the loans in the securitization was secured by property that included both REMIC-qualified and non-REMIC-qualified elements of value, it should be borne in mind that, as acknowledged by Mr. Biafore, Nomura’s REMIC expert, an occupied (or “stabilized”) property will have a higher value than it would if it were unoccupied (or “dark”). Hence, the value of a stabilized property (which all of the relevant properties were) necessarily includes intangible elements of going-concern value. As previously discussed, those intangible elements of value are includable in the value of the real property for REMIC purposes only to the extent they are “inextricably linked” to the real property. Thus, in the case of any mortgaged stabilized property, “some of the loan collateral [will] not [be] REMIC-qualified,” to paraphrase language used by the majority. The question is always whether enough of the value is REMIC-qualified to reach the required 80% VTL ratio. Based on the information Nomura provided to Cadwalader, there was nothing unusual about Doctors Hospital in this regard.
I reject the majority’s assertion that I “fail[ ] to appreciate” the significance of the Deal Highlights document’s supposed revelation that the hospital’s appraised value “may have included non-REMIC real property.” To reiterate, since each of the 156 loans was secured by an occupied, income-producing property, the appraised value of each of those properties — not Doctors Hospital alone — included elements of value that were not REMIC-qualified. Thus, the majority is simply incorrect in stating that this issue somehow “sets the Doctors Hospital Loan apart from the other loans in the securitization.”[6]
In glibly stating that “[t]he question here is not . . . whether the Doctors Hospital Loan was different from the other loans,” the majority elides the question that emphatically is the subject of this appeal. To reiterate, that question is whether, on this record, Cadwalader had any information about the Doctors Hospital loan that placed its REMIC-qualification in question to *252 a greater degree than any of the other 155 loans. If not, the implication of the majority’s position is — in spite of the portions of its opinion that appear to indicate otherwise — that Cadwalader was obligated to conduct due diligence concerning the REMIC-qualification of each of the 156 loans, notwithstanding Nomura’s decision not to retain the law firm for that purpose.
Mr. Adelman also testified that he reviewed the property valuations that Nomura had provided to him to satisfy himself that none of the loans raised an apparent REMIC problem. While he acknowledged that the valuation figures provided to him were not broken down into real-property and non-real-property elements, Mr. Adelman stated that, based on his experience, he made a judgment as to whether each total valuation figure was likely to include sufficient REMIC-qualified real property to meet the 80% threshold. He testified that, in his experience, it would have been extremely unlikely for real property to account for less than $40 million of the $68 million total valuation the appraiser had placed on Doctors Hospital.[7] Mr. Adelman testified that, based on his assessment of the high likelihood that the appraised value of the hospital included at least $40 million of real property value, and in view of his knowledge that Nomura, which had chosen to do its own due diligence for this transaction, had been properly advised of the REMIC requirements, he thought it unnecessary to inquire further about the Doctors Hospital loan.[8] Notably, when the motion court invited *253 Cadwalader to comment on the Deal Highlights document, defense counsel submitted a letter drawing attention to this testimony by Mr. Adelman, as well as to the aforementioned testimony by Ms. Glick, among other evidence, to establish that nothing in the document gave Cadwalader any reason to question Nomura’s representation that the Doctors Hospital loan met the threshold 80% VTL ratio. Neither Nomura nor the majority points to any contrary testimony in the record.[9]
What Cadwalader did not, but Nomura did, have in its possession at the time of the securitization, was the actual August 1997 appraisal of Doctors Hospital that had served as the basis for the underwriting of the loan. That appraisal, unlike the Deal Highlights document, breaks down the $68 million valuation figure into the following components:
“Allocation of Value
Land $ 3,000,000
Building and Site Improvements 27.960.000
Equipment 9,640,000
Intangibles_ 27.400.000
Total $68,000,000”
On its face, this appraisal values the “sticks and bricks” to which Ms. Glick referred at only $30,960,000. According to Ms. Glick’s uncontradicted testimony, because this figure was less than 80% of the loan value, it should have prompted Nomura, based on the advice Cadwalader had given it (as found by the *254 majority), to ask Cadwalader to undertake a further analysis to determine whether the Doctors Hospital loan qualified for inclusion in a REMIC securitization.[10] Arguably, if this appraisal had been in Cadwalader’s possession at the time of the securitization, there would be a triable issue of fact as to whether the applicable standard of care required Cadwalader to make further inquiry to determine whether the Doctors Hospital loan in fact had a REMIC-qualifying VTL ratio. It is undisputed, however, that Nomura never gave anyone at Cadwalader a copy of the appraisal up to the time of the closing, and nothing in the record supports an inference that the firm had any reason to ask to see the appraisal. Nonetheless, the majority decides this appeal as if Cadwalader had the appraisal in hand when the securitization closed.
The majority fails to come to grips with the lack of any information in the Deal Highlights document that might have materially distinguished the Doctors Hospital loan from the other loans being packaged in the securitization. As previously stated, each of the 156 loans was secured by a property that was the site of an income-producing, going-concern business; and, in any event, Cadwalader was aware of the general nature of the Doctors Hospital property independent of the Deal Highlights document. Contrary to the majority’s assertion that it is somehow “misleading” for me to rely on Mr. Adelman’s testimony about the absence of any “red flag” because “he was not talking about the ‘Deal Highlights’ document,” I make no implication that the quoted testimony refers to that document (which apparently was not shown to the witness). Mr. Adelman’s uncontradicted testimony is nonetheless fatal to Nomura’s claim, however, because what the witness was discussing is the very same information that the majority finds so damning when set forth in the Deal Highlights document — that the property securing the loan was an operating, income-producing hospital, the *255 going-concern value of which was part of the security for the loan. Mr. Adelman, whether or not he or anyone else at Cadwalader read the Deal Highlights document, was well aware of this information, and, as previously discussed, he explained, under oath, why it did not constitute a red flag. This explanation is not contradicted anywhere in the record.[11]
Notably, Nomura’s theory, as articulated by its REMIC expert, Mr. Biafore, and its expert on the standard of care for the preparation of legal opinion letters, Arthur Norman Field, Esq. (neither of whom ever saw the Deal Highlights document), is that Cadwalader was obligated to review the appraisal report for the property securing each loan (although Nomura had instructed it not to do so) and would have been alerted to a problem with the Doctors Hospital loan from the appraisal of that property. While the Doctors Hospital appraisal report, unlike the Deal Highlights document, contained a breakdown of the bottom-line $68 million valuation figure into its different elements — and I agree that the appraisal’s valuation breakdown arguably would have constituted the proverbial “red flag,” given that it attributed only $30.96 million of the property’s value to elements that plainly qualified as real property for REMIC purposes — Nomura chose not to provide the appraisal report to Cadwalader. To reiterate, the majority specifically rejects Nomura’s theory that Cadwalader, notwithstanding Nomura’s exclusion of due diligence from the scope of its retention, was obligated to review each appraisal report even in the absence of any indication of a potential problem with a particular loan. As previously discussed, none of the information about Doctors Hospital that Nomura provided to Cadwalader, including the information set forth in the Deal Highlights document, gave an indication of a possible REMIC problem with the Doctors Hospital loan.
The majority also fails to come to grips with Ms. Glick’s uncontradicted testimony that she advised Nomura to alert Cadwalader if the stand-alone value of the land and building (“sticks and bricks”) of the property securing any loan did not equal at *256 least 80% of the amount of the loan. This advice, combined with the breakdown of the valuation of Doctors Hospital in the appraisal report (which valued the land, building and site improvements at only $30.96 million) — a valuation breakdown that Cadwalader never saw before the closing, because Nomura chose not to provide it with the appraisal report — should have prompted Nomura to bring the loan to Cadwalader’s attention and to ask it to undertake further analysis to determine whether the loan was, in fact, suitable for inclusion in a REMIC. Given that Nomura, for reasons of its own, chose not to have Cadwalader conduct general due diligence, Nomura should not be permitted to hold Cadwalader liable for what was Nomura’s own oversight, in spite of its having received advice sufficient to allow it to spot the issue when conducting its own due diligence.
The majority asserts that my view that Nomura should not be allowed to hold Cadwalader liable for Nomura’s own oversight is “inconsistent with the dissent’s acknowledgment that Cadwalader could not ignore warning signs in the Deal Highlights document if it saw any.” There is no inconsistency in my views. Again, the majority is ignoring the fact that Nomura’s oversight was in overlooking a “warning sign[ ]” — the breakdown of the valuation into its different elements — that was present in the appraisal report, which Nomura chose not to provide to Cadwalader, but was not present in the Deal Highlights document or any other document with which Cadwalader had been provided. And, to reiterate, Ms. Glick’s uncontradicted testimony establishes that Cadwalader’s advice to Nomura should have sufficed to enable the sophisticated finance professionals at Nomura to perceive the “warning sign[ ]” in the appraisal report. In sum,,Nomura, having been duly advised by Cadwalader of what to look for in choosing loans for inclusion in the securitization, chose to perform its own due diligence. This being the case, Nomura should not be allowed to recover from Cadwalader for a loss that was caused by Nomura’s own negligence in performing that due diligence — negligence that consisted in overlooking a warning sign in a document that Nomura had chosen not to provide to Cadwalader.
The majority makes much of the fact that the Deal Highlights document mentioned that one of two alternative methodologies for appraising Doctors Hospital, the cost approach, yielded a value of $40.6 million, which was just above the $40 million figure the value of the real estate had to reach to satisfy the *257 80% REMIC threshold.[12] However, the Deal Highlights document stated that the ultimate “appraised value” of Doctors Hospital was the $68 million figure yielded by the capitalized income approach, reflecting the professional appraiser’s conclusion that the income approach, rather than either of the two alternatives, was the appropriate methodology.[13] This was consistent with the uncontradicted testimony of Mr. Gershon, the former Nomura executive who supervised the securitization, to the effect that “[i]t is the income approach as opposed to the cost approach that’s generally indicative of the value of an asset, particularly for REMIC purposes.” Notably, Mr. Biafore, Nomura’s REMIC expert, quoted this testimony in his affidavit, and did not express any disagreement with it. Further, as previously discussed, Mr. Adelman explained that, in his judgment, there was no need for further inquiry about the Doctors Hospital loan because, in his experience, there was a very high likelihood that a $68 million appraisal figure for a property would include at least $40 million of real property value within the meaning of REMIC.
The majority accuses me of “ignor[ing]” Mr. Adelman’s testimony that it was his practice to make further inquiry if the valuation figure given to him by a client came close to the 80% minimum VTL ratio required by the REMIC rules. While I of course acknowledge this testimony, it does not change the fact that the operative valuation figure for Doctors Hospital that Nomura provided to Cadwalader — based on the advice of the professional appraiser Nomura had retained — was $68 million, far above the minimum $40 million real-estate valuation that was needed for REMIC purposes. The majority identifies nothing in the record to put in question the view of Nomura’s appraiser that the relevant appraisal methodology was the income approach that yielded the $68 million valuation. Again, even Nomura’s REMIC expert raised no objection to this view when he quoted Mr. Gershon’s testimony expressing it. Indeed, not even Nomura itself, when asked by the motion court to address the Deal Highlights document, made any argument that the alternative $40.6 million “cost” valuation rejected by the appraiser was a “red flag” indicating a potential REMIC problem.
*258 The weight that the majority places on the Deal Highlights document is odd when one considers that Nomura itself thought that document worth only two fleeting references in its appellate brief. The majority’s vastly understated concession that the Deal Highlights document was not “the primary focus of Nomura’s brief” cannot hide the fact that this document — which, to reiterate, neither side mentioned at its own instance at oral argument on appeal, which was only made part of the record at the motion court’s request, and which Nomura did not show to its expert witnesses — was not any kind of focus of Nomura’s arguments, primary or otherwise, either here or before the motion court.[14] Plainly, Nomura’s brief does not suggest the majority’s apparent view that the Deal Highlights documents is the one piece of evidence in this extensive record on which the outcome of the appeal should hinge. Rather, Nomura argued that Cadwalader failed to give it proper advice about the REMIC rules and that it was Cadwalader’s job to conduct due diligence to confirm that each securitized loan had a REMICqualifying VTL ratio — arguments that the majority expressly rejects, and with good reason. Although the majority asserts that “Nomura did not rely solely on th[e] [Deal Highlights] document,” it is closer to the truth to say that Nomura did not rely on this document at all, and certainly did not point to it as the “red flag” perceived by the majority.[15] Moreover, the majority overstates the importance of the Deal Highlights document to the motion court’s decision. That document was not the linchpin *259 of the motion court’s denial of Cadwalader’s summary judgment motion, as it is of the majority’s decision. There is no indication in the motion court’s decision that it would have reached a different result had Cadwalader not been provided with the Deal Highlights document, nor did the motion court — or, for that matter, Nomura’s eminent counsel — describe it as “critical,” as the majority does.
The majority’s grounding of its decision on the Deal Highlights document, after rejecting all of Nomura’s arguments on the issue of whether malpractice occurred, no doubt comes as a surprise to both parties. That Nomura relied primarily on a “broader theory” did not preclude it from making a secondary argument that Cadwalader’s liability could be predicated on its receipt of the Deal Highlights document. It is of course true that a skilled advocate, rather than making every conceivable argument in support of the client’s position, generally strives to focus the court’s attention on the client’s strongest arguments. This only makes it more surprising that the majority decides the appeal based on an argument that Nomura’s counsel apparently found not worth making to us, even as a backup. In deciding the appeal on this ground, the majority is not merely “narrowing the issues for trial” (as it claims), but is itself creating, and treating as the sole ground for disposition (unlike the motion court), a new issue that neither of the parties has raised.[16]
If the Deal Highlights document could reasonably be viewed as a “red flag” that should have prompted further inquiry by Cadwalader, I would concur in the majority’s determination, notwithstanding that the parties and their able counsel apparently overlooked this document’s significance. I cannot see, however, that counsel for either side made any mistake in placing little or no weight on the Deal Highlights document, which, so far as can be determined from this extensive record, did not contain any information that would have materially distin *260 guished the Doctors Hospital loan from the other 155 loans involved in the securitization. If Cadwalader was obligated to make further inquiry about Doctors Hospital based only on the knowledge that the hospital was a going concern and that the law firm had not been given a breakdown of the appraised value into real-estate and non-real-estate elements, Cadwalader would have been obligated to make further inquiry about every one of the 156 loans — essentially, to conduct the due diligence for which its highly sophisticated investment-banking client had deliberately declined to engage it. It is troubling that the majority’s decision requires a law firm to stand trial for malpractice in failing to perform a function for which, as is undisputed, its highly sophisticated client, in order to minimize the costs of the transaction, deliberately chose not to engage it.
For the foregoing reasons, I would reverse the order appealed from and grant Cadwalader’s motion for summary judgment dismissing the first cause of action in its entirety. Accordingly, I respectfully dissent from the contrary result reached by the majority.[17]
Sweeny and Renwick, JJ., concur with Richter, J.; Friedman, J.E, dissents in part in a separate opinion.
Order, Supreme Court, New York County, entered on or about January 13, 2012, modified, on the law, to grant the motion with respect to that part of the cause of action alleging that defendant failed to properly advise plaintiffs, and otherwise affirmed, without costs.

. The Deal Highlights document is part of the record only because the motion court, having seen it briefly discussed in the transcript of the deposition of one fact witness, asked the parties to submit a copy of it while the summary judgment motion was sub judice. Thus, in their original submissions on the motion, neither side thought the Deal Highlights document — to which the majority ascribes outcome-determinative significance — to be of sufficient importance to warrant inclusion in the record. While it is true, as the majority states, that the Deal Highlights document was “the subject of questioning by the bench” at the argument of this appeal, the fact is that this “questioning” consisted of only one question that made reference to the document, and counsel — understandably, in a case involving such an extensive record-— answered the question under the misapprehension that the justice was referring to a different document, namely, the prospectus for the securitization. This misunderstanding — which, regrettably, was not corrected — again highlights that the parties themselves have attached no significance to the document.

. The former Nomura executive who had been in charge of the subject securitization, Perry Gershon, was asked the following question at his deposition in this matter: “Nomura did not ask, expect or want Cadwalader to review the appraisals underlying the property securing the loans in the [securitization]; correct?” To this question, Gershon responded: “Correct.” As the majority correctly holds, Cadwalader had no general obligation to conduct due diligence that its client did not want it to perform.

. Cadwalader did not represent Nomura in the origination of the Doctor’s Hospital loan.

. Nomura’s REMIC expert, Thomas J. Biafore, Esq., agreed that intangible interests “inextricably linked” to the real property could be included in the value of the real property for REMIC purposes, so this point is uncontroverted. Whether or not the majority wishes to acknowledge the point that some intangible interests may be included in a real property valuation for REMIC purposes is irrelevant, as even Nomura’s REMIC expert agrees that this is tbe case. Moreover, the majority mischaracterizes my position on the advice Cadwalader gave Nomura about how to choose loans for a REMIC, as established by the record. As described in the sentences in the text immediately following this footnote, and in footnote 5, the record establishes that Cadwalader advised Nomura that (“to be prudent,” as stated in Cadwalader’s letter to the motion court addressing the Deal Highlights document) it should exclude personal property and intangible interests of any kind (whether or not “inextricably linked” to real estate) from the valuation of mortgaged real property in conducting its own due diligence on loans being considered for REMIC securitization. As discussed more fully below, the record establishes that Nomura failed to do this in the case of the Doctors Hospital loan and, before the closing, Cadwalader had no information in its possession to indicate that such a failure had occurred.

. Cadwalader partner Anna Glick states in her affidavit:
“Prior to the [securitization’s] closing, Cadwalader provided detailed advice to Nomura regarding how to satisfy the 80% Test. As part of that advice, a rule of thumb communicated by Cadwalader to Nomura was that the value of what was plainly real *250 property (such as land and structural improvements, or ‘sticks and bricks’), should be added up by Nomura to see if it amounted to at least 80% of the loan amount. If those items alone satisfied the 80% Test (and they usually did), then the 80% Test would be satisfied. If not, then Nomura needed to inquire further to determine whether the loan met the 80% Test.”
Ms. Glick’s testimony on this point, which she reiterated at her deposition, is uncontroverted.

. As to the “alternate valuation” of Doctors Hospital set forth in the Deal Highlights document, while I address that point more fully at a later point in this opinion, here it will suffice to say that, as reflected in the Deal Highlights document, Nomura’s appraiser concluded that the appropriate appraisal methodology was the one that yielded a value of $68 million, which was far from “perilously close” to the $40 million figure required for REMIC purposes.

. Again, the hospital’s real property value had to be at least $40 million to comply with the REMIC requirement that the value of the mortgaged real property be at least 80% of the value of the $50 million loan.

. Mr. Adelman testified as follows:
“I formed a judgment that a loan [sic] was valued at $68 million. Even in my experience and judgment, even if it consisted of a significant part of some personal property as well as real property, that it was — would not have been consistent with high [sic] experience that the real property portion was less than $40 million or putting it another way, it was not apparent on its face that someone, anyone who was involved in the valuation process, in the due diligence process or at Nomura did not do their job.
“No red flag was raised that this loan might have had an unusual amount of personal property, so that no red flag raised that caused me to inquire further.”
Shortly thereafter, he further testified:
“It was my judgment that the ratio between personal property and real property on a loan of $50 million supported by an aggre *253 gate valuation of [$]68 million would have been. It would have been highly unusual for it to have resulted in a real property value of less than $40 million for a going business in a particular building and location.”

. While it is true, as the majority states, that “it is unknown whether Cadwalader read the [Deal Highlights] document” or, if anyone at the firm did read the document, how that person interpreted it, I fail to see why this makes any difference to the outcome of this appeal. Neither do I see why the majority considers it significant that Cadwalader did not submit an affidavit from one of its attorneys concerning what the firm did with the document after receiving it. Since it is undisputed that Cadwalader received the document about three weeks before the closing, if there really were a red flag in the document, Cadwalader could not defend itself on the ground that nobody in the office actually read it. My view, however, is that the document contained no red flag, as a matter of law. Again, I find it remarkable that the majority apparently sees nothing odd in the fact that the able counsel for each side, in the extensive discovery that has been conducted in this action, did not expend more effort to ascertain what Cadwalader did with the Deal Highlights document after receiving it. It appears that the majority perceives a significance in this document that has been invisible to the parties and their counsel up to this point in the litigation.

. That the appraisal valued the land and building, by themselves, at less than $40 million does not necessarily mean that the loan was not REMICqualified. As previously discussed, intangible values “inextricably intertwined” with the real property, and equipment that would be deemed to qualify as fixtures under the REMIC rules, would be included in the value of the real property for purposes of determining whether the requisite 80% VTL ratio was satisfied. Indeed, Nomura argued in subsequent litigation that a sufficient amount of the value the appraiser attributed to “Equipment” and “Intangibles” could be allocated to real property to reach the 80% VTL ratio threshold. However, the extent to which the intangibles and equipment included in Doctors Hospital’s valuation were classifiable as real property for REMIC purposes could not be determined from the face of the appraisal upon which the loan was underwritten.

. It is true, as the majority notes that Mr. Adelman and one of Cadwalader’s legal experts conceded, that “a lawyer cannot blindly rely on a client’s representations if the lawyer sees something inconsistent with them.” The majority fails, however, to identify anything in the information Nomura provided to Cadwalader before the closing of the securitization that was inconsistent with Nomura’s representation that the Doctors Hospital loan met the 80% REMIC threshold. As more fully discussed below, an alternative valuation of the property referenced in the Deal Highlights document does not change this conclusion.

. Although not mentioned by the majority, the Deal Highlights document states that the other alternative appraisal methodology, the comparable sales approach, yielded a value figure of $64 million.

. The appraisal report explains that, under the cost approach, “property is valued based upon the market value of the land, as vacant, to which the depreciated replacement cost of the improvements and equipment is added.”

. The first reference to this document in Nomura’s brief is a record citation in the facts section offered as partial support for the statement that Nomura sent Cadwalader “detailed information about the characteristics of each loan.” The briefs second reference to the document is in a brief quotation from the motion court’s decision. Given that Nomura’s respondents’ brief barely touches on the Deal Highlights document, Cadwalader can hardly be faulted for not referring to that document in its reply brief.

. In the brief letter it submitted in response to the motion court’s inquiry regarding the Deal Highlights document, Nomura nowhere referred to that document as a red flag. Rather, Nomura asserted that the Deal Highlights document (1) “highlights the fact that Cadwalader was well aware that the D5 Securitization included a loan secured by a free standing acute care hospital” and (2) “further demonstrates that none of the other advisors retained by [Nomura] . . . addressed the REMIC regulations and/or whether the [Doctor’s Hospital loan] was 80% secured by real property within the meaning of those regulations.” As to the first point, Cadwalader does not claim to have been unaware that Doctors Hospital was “a free standing acute care hospital.” As to the second point, Cadwalader does not argue that it should have been granted summary judgment on the ground that Nomura should have looked to other advisors for advice on the Doctors Hospital loan’s compliance with REMIC regulations.

. While the majority takes umbrage at my statement that it has created the issue on which it is deciding the appeal, I think that this is a fair characterization, given the scant attention paid to the Deal Highlights document in Nomura’s appellate brief, and given that, at oral argument, (1) the document was referenced in only one question from the bench, (2) that reference was misunderstood by the attorney to whom it was addressed (Cadwalader’s counsel), and (3) Nomura’s counsel did not subsequently make use of, or even mention, the document in her argument. I agree that is impossible to cover exhaustively every facet of a case as complex as this one at oral argument, but the majority’s giving outcome-determinative effect to a single document that was not even mentioned in either side’s presentation — even after a justice referred to it in a question — is, to say the least, unusual in the extreme.

. Since I find that the record establishes that Cadwalader did not commit malpractice, I find it unnecessary to reach Cadwalader’s arguments that the conduct complained of did not proximately cause any damage to Nomura.